UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIANNE T. O'TOOLE, AS TRUSTEE OF THE
ESTATE OF MARY BEA FRATTO,

Plaintiff,

-against-

COUNTY OF ORANGE,

Defendant.

No. 16 Civ. 2059 (NSR)

**OPINION & ORDER**

---

NELSON S. ROMÁN, United States District Judge

Plaintiff Marianne T. O'Toole ("Plaintiff"), proceeding as the bankruptcy trustee of Mary Bea Fratto ("Fratto"), brings this action against Fratto's former employer, the County of Orange ("Defendant"). Plaintiff alleges that throughout Fratto's tenure at the Orange County Correctional Facility ("OCCF"), from November 2012 to October 2013, Defendant discriminated against her based on her sex, and, when she objected, retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

Before the Court is the Defendants' Motion for Summary Judgment on Plaintiff's sex-based discrimination and retaliation claims. (*See* Defendants' Motion, ECF No. 42, incorrectly originally filed as "Motion to Dismiss" but subsequently deemed a Motion for Summary Judgment, ECF No. 57.) For the following reasons, Defendants' Motion is DENIED.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/8/2019

1

# BACKGROUND[1]

## I. Fratto Seeks to become a Corrections Officer

Several years ago, Mary Bea Fratto, a former medical assistant, sought to work as Corrections Officer and took the test to enter the Civil Service. Four years after taking the test, OCCF notified Fratto that she was hired to work at the OCCF facility. In November 2012, Fratto began her employment by attending the OCCF's academy for 16 weeks. At the time, Fratto knew that, for one year, she would be on probation and under greater scrutiny than regular full-time officers. OCCF hired another female corrections officer, Lisa Castelan, at the same time as Fratto.

As Fratto neared the end of her probationary period, she noticed that she was frequently working night shifts in Echo 3, a dorm-style housing unit. According to Fratto, Echo 3 was considered a more desirable assignment because it housed fewer inmates, and the inmates were more self-sufficient.

## II. Duties and Policies Related to Work as a Corrections Officer

As a Corrections Officer, Fratto's duty was to document everything that happened on a unit, during her shift, in a logbook. She also had to perform rounds of the housing unit every thirty minutes and conduct a security check on every shift. Fratto frequently worked the midnight shift, which was from 23:00 to 7:00 (11:00 PM to 7:00 AM). Within this shift, inmates were supposed to be in their bunks/cells at 23:00 (11:00 PM), a time referred to as "lights out." After "lights out," inmates were supposed to keep their volume down and respect the other inmates who were sleeping. Fratto occasionally allowed inmates to continue talking quietly after "lights out." She did not, however, allow them to leave their bunks without her permission.

---

[1] The facts are drawn from the Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") (ECF No. 47) and Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1.") (ECF No. 56) and the exhibits attached to each. They are undisputed except where indicated.

OCCF has certain policies that pertain to its inmates and certain that pertain to employees. For example, inmates are not supposed to intentionally touch officers. If an inmate intentionally touches an officer, the officer is supposed to report the incident. OCCF also maintains a Discrimination Policy ("Policy"), which Fratto received, that includes a Section on "Sexual and Other Unlawful Workplace Harassment." (*See* Policy, ECF No. 55, Ex. 1.) The Policy provides "Examples of Sexual Harassment" and contains a formal complaint resolution process that applies to employees at OCCF.[2]

### III.    Rumors of an Affair Swirl, and Fratto Complains

In early May 2013, female officers began making comments to Fratto, claiming that she was having an affair with Sergeant Jeffrey Long ("Sgt. Long"). For example, one female officer told Fratto in the locker room "It's not who you know it's who you blow." Another, when the phone in the locker room rang, chided: "It must be Sergeant Long on the phone for Fratto." On May 25, 2013, yet another female officer, Cheryl Rooney, told Fratto that she was going to "mess up his marriage," like another unidentified female officer once did. Officer Rooney also told Fratto to "stop having sex with Sergeant Long." In the beginning, Fratto ignored the rumors and did not report them to any superior in a written complaint. The parties dispute whether anyone else— including Sgt. Long, Fratto's other supervisors, or any other individuals above the Officer rank— ever made such comments.

On May 30, 2013, Fratto contacted Kathy Critelli ("Critelli") to discuss the salacious rumors. Critelli told Fratto that she would notify Lt. Catletti ("Lt. Catletti") about thm. Two days later, on June 1, 2013, Lt. Catletti addressed the officers at lineup, telling them to stop badgering

---

[2] Notably, while Defendant and Plaintiff have both submitted a copy of The Policy (*See* ECF No. 43, Ex. G), Defendant's submission ominously lacks "page 2" – a critical page relating to the issues in this dispute. Defendant has not provided the Court with any reason for their deficient submission.

one another. According to Fratto, during this talk, Lt. Catletti specifically said that officers should stop harassing "a female officer."

Later that same evening, Officer Leandra Daniel-Weir ("Weir") contacted Fratto and told her: "Take my name out of your mouth" and that she was going to go "Tasmanian on … Fratto." The following day, Fratto discussed the comments from the female officers with Sergeant Curreri. ("Sgt. Curreri"). Sgt. Curreri then directed Fratto to prepare a written complaint regarding her claims. That same day, Fratto prepared two memoranda for Captain Anthony Mele ("Cpt. Mele") describing her claims. (*See* Memos Dated 6/2/13, ECF No. 43, Ex. I, J.)

Within the same week, Critelli also contacted Captain Jacqueline Bennett ("Cpt. Bennett") about Fratto's complaint. (*See* 6/6/13 Memo from Critelli to Bennett, ECF No. 55, Ex. 2.) In response, on June 4, 2013, Cpt. Bennett met with Fratto to discuss Fratto's complaint. Fratto's union representative, Officer Nestor, attended at the meeting. Fratto told Cpt. Bennett about the comments the female officers were making towards her about the alleged affair with Sgt. Long. Cpt. Bennett told Fratto that she was there to protect Fratto and would investigate the matter.

Lt. Catletti subsequently directed all involved officers to submit reports to him on Fratto's claims. As part of the investigation, Officers Falu, Weir, Rooney, Ciampa, and Long were interviewed. Officer Rooney was counseled against providing unsolicited advice to others. After Fratto's meeting with Cpt. Bennett, Fratto's co-workers stopped spreading rumors about Fratto.

## IV.    Subsequent Inmate Misconduct

About a month later, on July 6, 2013, Fratto was supervising inmates in Echo 3. Fratto was the only officer assigned to Echo-3 that night. She arrived on the unit at approximately 23:00, at which time she noted certain inmates being loud. One inmate, LH, was being especially loud while speaking to her sister, who was on a neighboring bunk. At one point, LH and her sister were talking

4

about male genitals. Other inmates told LH to quiet down. Subsequently, LH got off her bunk and approached the inmate who told her to quiet down and then returned to her bunk.

Shortly after LH returned to her bunk, Fratto entered Echo-3 and had a conversation with LH. While talking to LH, Fratto was standing near LH's bunk. During the conversation, LH momentarily waived her arm towards Fratto, in response to which Fratto flinched. (*See* Video Footage, ECF 43, Ex. W.)

The following day, July 7, 2013, three inmates complained to Sgt. Torres about the noise from the night before in Echo-3. The inmates complained that, on the evening of July 6, 2013, inmates were talking after lock down time, and when one inmate ("GC") asked LH to stop talking, LH left her assigned bunk and threatened GC. (*See* Inmate Letters, ECF 43, Ex. V.)

Sergeant Ryan ("Sgt. Ryan") investigated the inmate complaints. As part of his investigation, he reviewed facility video and confirmed LH's movements and that LH pointed her finger towards GC and other inmates in GC's area. (*See* Video Footage.) Sgt. Ryan also interviewed GC who confirmed that LH and her sister usually talk all night, a claim that other inmates corroborated. The parties dispute whether GC and/or other inmates told Sgt. Ryan that Fratto regularly participated in these conversations. During the investigation, Sgt. Ryan asked Fratto about the incident and whether she knew that LH threatened another inmate on July 6, 2013.

On July 8, 2013, upon being directed to do so, Fratto prepared an officer's report in which she relayed whether she had observed LH threaten GC. (*See* ECF No. 43, Ex. K.) In her report, Fratto claimed she saw LH "dancing" by another inmate's bunk. (*Id.*) After Fratto issued her report, Sgt. Ryan reported that he again reviewed the facility video and saw that at approximately 23:12:37, Fratto walked towards LH who was lying on her bed. The parties dispute whether it was discernable on the video that LH made physical contact with Fratto's genital area or whether Fratto

momentarily glanced at the security camera.

On July 8, 2013, Sgt. Ryan also prepared a report and notified Lt. Potter, who then wrote a report to Cpt. Bennett about the incident. On July 19, 2013, Sgt. Colby and Penney interviewed ten inmates from Echo-3 about the incident. The parties dispute whether, in advance of these interviews, Fratto told certain inmates what to say if anyone questioned them about the incident.

Sgt. Colbey reviewed the facility video and confirmed that, on July 15, 2013 at approximately 08:34, Fratto had an approximately five-minute conversation with inmates SO and KJ in a hallway at OCCF. The parties dispute the contents of the depicted conversation.

Inmate KJ subsequently submitted a letter to support Fratto. On July 24, 2013, Fratto received a Supervisor's Inquiry with questions about the events of July 6, 2013. (*See* Supervisory Inquiry, ECF No. 43, Ex. L.) On July 24, 2013, Fratto provided Cpt. Bennett a memorandum answering the questions in the Supervisor's Inquiry. (*See* Inter Office Memo, ECF No. 43, Ex. M.) In response to Question No. 2, Fratto stated that she did not participate in any conversation with inmates LH and LW. In response to Question No. 5, Fratto responded that she observed inmate LH get up from her bunk, walk towards bunk #21, laugh, and do a "little dance." In response to Question No. 11, Fratto responded that inmate LH did not attempt to touch Fratto at any time.

On August 5, 2013, Fratto, along with her Union Representative Sgt. Kiszkazka ("Kiszka"), met with Cpt. Bennett. During the meeting, the parties viewed the video footage from July 6, 2013. While the video was running, Cpt. Bennett asked Fratto if she saw LH get up from her bunk and walk towards another inmate's bunk. Fratto, who alleges that it was her first time watching the footage, initially responded that LH got up from her bunk to get her laundry. Cpt. Bennett, however, stated that the video did not support Fratto's interpretation of the events.

The video continued to run, showing LH appear to address inmate GC and then walk back

towards her bunk. (*See* Video Footage.) The video showed that Fratto entered the room after which she and LH shortly conversed. (*Id*.) The parties dispute whether the video then depicted LH make any hand gesture towards Fratto, whether Fratto momentarily glanced towards the camera, or whether LH sexually assaulted Fratto during their interaction. In response to reviewing the video, Cpt. Bennett claimed that it looked like LH had sexually assaulted Fratto.

The parties dispute what Cpt. Bennett stated next. Cpt. Bennett claims that she then stated that "errors in judgment can be mitigated, but lies cannot." Fratto, on the other hand, claims that Cpt. Bennett stated: "you're lying like you were lying about Sergeant Long."

The parties dispute exactly what happened next. According to Fratto, at Cpt. Bennett's direction, Kiszka told Fratto that he would write a report for Fratto to give Cpt. Bennett "what she wanted." Further, since Cpt. Bennett kept telling Fratto that she was "lying" about LH touching her, Kiszka, again at Bennett's direction, prepared a memo stating the Fratto had been "untruthful" with her prior responses. Consequently, because she was relying on Kiszka, Fratto claims that she admitted that she was "untruthful" in the questionnaire. Fratto claims that, both before and after watching the video, she simply interpreted the "uneventful" events of July 6, 2013 differently from Cpt. Bennett and only used the word "untruthful" because she was advised to do so by Kiszka, who knew what Cpt. Bennett wanted.

Subsequently, Cpt. Bennett prepared a report to Jones describing concerns that Fratto had failed to be observant in a dormitory setting and ignored an inmate getting out of her bed and walking towards another inmate. In this report, Cpt. Bennett relayed her determination that Fratto was deficient in her duties as a Corrections Officer (*i.e.* Fratto "seems to lack proper judgment in elementary jail situations and enforcing certain rules") and also was an "untruthful" employee.[3]

---

[3] The parties dispute the reliability of this report. Importantly, the Court notes that the report, which appears to be have been issued on July 22, 2013, describes events that purportedly took place in August 2013. (*See* Memo Re. Allegation

The investigation into the incident of July 6, 2013 concluded in August 2013. Four months later, on November 1, 2013, OCCF terminated Fratto. (*See* Termination Notice, ECF No. 55, Ex. 6.) OCCF notified Fratto of her termination shortly before her probationary period ended. The parties dispute whether Fratto had been offered retraining prior to being terminated. The parties do not dispute that Lisa Castelan and other male probationary officers who had started on or about the same time as Fratto passed their probationary periods successfully. Indeed, several are still employed by OCCF.

## V.    Procedural History

On or about January 10, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On January 7, 2016, the EEOC issued a Notice of Right to Sue. Plaintiff commenced this action on March 21, 2016. (*See* Complaint, ECF No. 1.) In response to the Complaint, Defendant filed a Motion to Dismiss the Complaint. (ECF No. 12.) On May 31, 2017, this Court denied Defendant's Motion to Dismiss. (ECF No. 20.) On June 21, 2017, Defendant answered the Complaint. (ECF No. 21.) The parties subsequently engaged in discovery, and on June 21, 2018, Defendant filed the instant Motion for Summary Judgment on both of Plaintiff's claims. (*See* Defendants' Motion.)

---

of Inappropriate Conduct Dated 7/22/2013, ECF No. 43, Ex. Q.) More concerning however, is that—as Plaintiff's counsel notes—this report, much like the OCCF Discrimination and Harassment Policy, is the second critical exhibit to this litigation that Defendant has submitted in an incomplete form. (*Compare id. with* ECF No. 55, Ex. 5.) Defendant has never stated that it was merely submitting pieces of key records. Nor has it explained why relevant interspersed pages are missing. While the gravitas of Defendant's conduct will be further discussed in the Discussion of this Opinion and relates to why many factual issues remain in dispute, the irony of Defendant's claim that Fratto was fired for untruthfulness is not lost on the Court.

# LEGAL STANDARDS

## I.  Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining

whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## II.    Title VII Sex-Based Discrimination

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.,* provides that an employer cannot discriminate against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a *prima facie* case of discrimination under Title VII, plaintiff must prove by a preponderance of the evidence that (1) she is a member of a protected class; (2) she is qualified for the position held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Stratton v. Department for the Aging for City of New York*, 132 F.3d 869 (2d Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973)). To establish an inference of discrimination, a plaintiff must prove that an adverse employment action was taken against her "because of discriminatory animus on the part of [her] employer." *See Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).

For Title VII discrimination claims based on disparate treatment, a plaintiff must also show that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself.")

A plaintiff's discrimination claim is further subject to the *McDonnell Douglas* burden-shifting standard. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). Under this framework, a plaintiff bears the initial burden of demonstrating her *prima facie* case. *Cortes v. MTA New York Transit*, 802 F.3d 226, 231 (2d Cir. 2015). Once a plaintiff demonstrates a *prima facie* case, a "presumption arises that the employer unlawfully discriminated." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). The burden then "shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp.,* 411 U.S. at 802. The "final and ultimate burden" then returns to Plaintiff to demonstrate that "defendant's reason is in fact pretext for unlawful discrimination." *See Cortes*, 802 F.3d at 231.

## III. Title VII Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that she participated in a protected activity, (2) that her employer was aware of this activity, (3) that she suffered an adverse employment action, and (4) that there was a causal connection between her engaging in the protected activity and the adverse employment action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). As with discrimination claims, retaliation claims are also analyzed under the *McDonnell*

*Douglas* burden-shifting test described above. *Ya-Chen Chen*, 805 F.3d 59. Hence, if a Plaintiff makes a *prima facie* showing and defendant then provides a legitimate non-retaliatory reason for the adverse employment action, a plaintiff then "must prove 'that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

## DISCUSSION

At its simplest, Defendant argues that Plaintiff's discrimination and retaliation claims fail because Plaintiff was terminated for a single reason: lying to a captain during an investigation into her conduct. (Defendant's Memorandum in Support of the Motion for Summary Judgment, ("Def. Mem.") at 1, ECF No. 46.) Specifically, Defendant claims that Plaintiff has not made out a *prima facie* case of disparate impact because: (a) she has not shown that she was similarly situated to other officers, (b) a fellow female officer was hired at the same time and successfully completed her probation, (c) she was hired and fired within a year from the same employer, and (d) the person making the termination recommendation was a member of the same protected class. (*Id.*) Defendant adds that Plaintiff's discrimination and retaliation claim fail because Defendant's legitimate reason for firing Plaintiff was her admitted dishonesty during an investigation into her conduct.

Plaintiff claims that she has presented sufficient evidence that she was subject to discrimination on the basis of sex. She also claims that she has shown that she was treated less favorably than similarly situated male probationary officers. (Plaintiff's Memorandum in Opposition to Defendant's Summary Judgment Motion, ("Pl. Mem.") at 22, ECF No. 53.) Regarding retaliation, Plaintiff claims that she has presented sufficient evidence that she possessed a good faith, reasonable belief that the underling employment practice was unlawful, and a

reasonable jury could find that her engaging in protected activity was a "but for" cause of her termination. (Pl. Mem. at 12-14.) The Court agrees with Plaintiff.

## I. Sex-Based Discrimination Claim

The Court begins by assessing whether Plaintiff has provided sufficient evidence to support her claim that Defendant discriminated against Fratto based on Fratto's sex, in violation of Title VII. First, Fratto is indisputably a woman, which satisfies the first element. Second, both parties agree that: Fratto took a test to enter the Civil Service list for being a Corrections Officer, four years after taking the test, was notified that she was hired to work at OCCF, and then attended the academy for 16 weeks. (*See* Pl. Rule 56.1 ¶¶ 7-9 ECF No. 56.) There is also no dispute that she was notified on October 14, 2013 that she was being terminated from her position for having "failed to successfully complete [her] Probationary period." (*See* Termination Notice.) Hence, the first three elements are clearly supported as Plaintiff has shown that: 1) Fratto was a member of a protected class, 2) who was qualified for her position, and 3) who was terminated. That leaves only the fourth element: that the adverse employment action occurred under circumstances giving rise to an inference of discrimination—that is, discriminatory intent.

Although in the Court's previous decision, it held that Plaintiff's allegations regarding her sex discrimination claim only survived by a "razor thin margin," discovery in this case has brightly colored Plaintiff's previously opaque claims. The situation is a far cry from the type of baseless complaints referenced by Defendant's cliché (and inapposite) quote on insufficient pleadings.

To begin, Defendant claims that there is no evidence that Fratto was terminated for a sex-based reason, and apart from her being a woman, she cannot support an inference of sex-based discrimination. Further, Defendant claims that she has not established that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself. (*See*

Def. Mem. at 3.) Defendant's arguments reflect a mistaken interpretation of what Plaintiff is required to show for her Title VII claim to survive at this stage. A plaintiff can sustain a claim for sex-based discrimination:

While Defendant is correct that under a disparate-impact based theory for sex-based discrimination, Plaintiff must also show that she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself, the Second Circuit in *Feingold* explained that this criterion need not be assessed too literally. *Feingold v. New York*, 366, F.3d 138, 149 (2d Cir. 2004). Rather, it explained that the Court's job is to assess whether a plaintiff has shown enough evidence that similar employees are being treated dissimilarly in comparable situations, such that it would be reasonable to infer that an employer's ultimate motive for the dissimilar treatment is discriminatory animus. *See generally id*. at 153; *Graham v. Long Island R.R.*, 230 F.3d at 39.

Moreover, the Second Circuit has frequently elaborated on what "all material respects" means in determining whether two employees are "similarly situated." For example, in *Graham*, it explained that the *McDonnell Douglas* standard does not require an employee's conduct to be "identical" to that of another for the two to be similarly situated. *Id*. at 39-40 (explaining that the Supreme Court used the phrase "comparable seriousness" to identify conduct that could generally help support an inference of discrimination). The Second Circuit further explained that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury" and rather than focus on "precise equivalence," courts should consider: 1) whether the plaintiff and those she maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. *Id*. ("the standard for comparing conduct requires

14

a *reasonably close resemblance* of the facts and circumstances of plaintiff's and comparator's cases rather than a showing that both cases are identical.") (emphasis added).

In *McGuinness v. Lincoln Hall,* the Second Circuit reiterated that an employee's situation need be "sufficiently similar to plaintiff's to support at least a *minimal inference* that the difference in treatment may be attributable to retaliation." 263 F.3d 49, 54 (2d Cir. 2001) (emphasis added). There, the Second Circuit upheld the district court's decision to compare plaintiff and other employees with the "broadest outlines" and affirmed that the employees' differences were "not so significant as a matter of logic as to render defendant's disparate treatment … irrelevant to plaintiff's claims of discrimination."

Similarly, in *Feingold*, the Second Circuit upheld the district court's determination that the plaintiff was similarly situated to his co-workers, despite them not being probationary employees, as he was. 366 F.3d at 153. The Court explained that even though the employees were not similarly situated *with respect to the conditions under which they could be terminated*, the fact that they were not disciplined for engaging in conduct for which plaintiff was disciplined was enough to support an inference of discrimination. *Id*. In other words, the Court broadly focused on whether the constants between the employees were enough to test the variable, not whether the employees were formalistically similar on every axis.

Here, Plaintiff presented sufficient proof that there were several male probationary employees who were subject to the same workplace standards as Fratto who committed similarly serious (or more serious) infractions to hers—and yet were promoted. Fratto shows that these officers made errors in judgment and created inaccurate records. For example:

- **George Stein**: was promoted to a permanent Correction Officer a few months before Fratto received her notice of termination, despite having "Unsatisfactory Performance" reviews. The reviews reflected that he frequently failed to make rounds within the mandated timeframes, wrote false entries in logbooks on at

least four occasions, allowed inmates into restricted areas without supervision, conducted inaccurate headcounts, was condescending when discussing issues with inmates, and allowed inmates to enter and exit cells without securing the cell doors. The records also reflect that he: was informed of the importance of following the policies and procedures to be timely and accurate, was coached and counseled on his performance areas that needed improvement, and was monitored for signs of improvement. One performance review even included the notation "Officer Stein has been taking advantage of this extra training" and that he has been "receptive with [ ] advice and information." Another, which was written in response to his leaving his keys lying around, reflected that he "improved after discussion about this issue." (ECF No. 55, Ex. 8.)

- **Kenneth McMickens**: was promoted to a permanent Correction Officer, despite having "Unsatisfactory Performance" reviews. The reviews reflected that he frequently made false entries in his log book, would get distracted and fail to secure inmates, gave shoelaces to an inmate that had just come off suicide watch, allowed inmates to walk around during lock in time, prevented inmates with access to the library to visit it, and allowed an inmate to leave without proper authorization or knowledge of his destination. The records also reflect that McMickens was repeatedly counseled on the importance of inmate accountability and the need to follow Facility Policy and Procedure. One record shows a lengthy list of items with regards to which McMickens' was determined to "need additional training." His superiors even wrote: "McMickens is a possible liability now and into the future to this facility," but they also wrote that "with the additional training and proper supervision …. McMickens may be able to overcome these issues and continue to have a successful career with [OCCF]." (ECF No. 55, Ex. 9, 10.)

- **Chad Broeckel**: was promoted to a permanent Correction Officer at about the same time that Fratto received her notice of termination, despite having many performance reviews in which he was deemed to "need improvement" or only "meet standards." One review by his supervisor reflected that Broeckel's "overall performance is below that of an average probationary Officer" and that he had only shown "minor improvements" but needed to "continue to progress to meet the requirements of a probationary Officer." (ECF No. 55, Ex. 11.)

The Court finds that these employees were similarly situated enough to allow a fact finder to infer that Fratto was discriminated against based on her sex. They were all probationary officers, who made errors in judgment, jeopardized the safety of inmates, failed to pay close attention to inmates' whereabouts, and frequently wrote false reports and logs. Stein wrote false entries in logbooks on at least four different occasions and often made

inaccurate headcounts. And McMickens allowed inmates to venture places without authorization and curtailed their movements when they had authorization—not to mention, he gave shoelaces to an inmate who just came off suicide watch and was described as a "liability" by his own supervisors. That they were all male probationary officers who were not subject to sexual epithets militates in Fratto's favor because it further underscores the possibility that the only reason she was treated differently, in not being counseled or promoted, is because of her sex. Fratto's sex, combined with Sgt. Long's sex and sexual orientation made Fratto uniquely vulnerable to rumors and epithets to which male heterosexual probationary officers were not exposed.

As the Second Circuit articulated in *Graham*, ultimately, the question of whether these employees were similarly situated in all material respects to Fratto is a question for the jury. Whilst Defendant belabors the point that none of these other officers are similarly situated because none of them "lied to a superior officer after questioning," the records show that many of them put false information in various documents and committed other acts that were arguably more serious than Fratto's because they directly jeopardized inmates' health and safety. Moreover, as the Court will discuss further in its retaliation section, the video footage is subject to wide interpretation. It is unclear that Fratto ever committed an infraction that warranted a "Supervisory Investigation" in the first place. It would not be a stretch for a trier-of-fact to conclude that Fratto never violated OCCF policies and that the investigation that yielded the terminable conduct was a pretext for discrimination itself.

Based on the questionable video footage and series of events between her complaints and her termination, the investigation in which she "lied" could have been motivated by discriminatory and retaliatory motives, as opposed to a legitimate one. Such a finding would

desacralize Defendant's saving grace argument. In short, Fratto has provided ample evidence to support a disparate impact claim, and on this basis alone, Defendant's Motion to Dismiss her Summary Judgment for sex-based discrimination is DENIED.

### A. Miscellaneous Arguments

Additionally, Plaintiff is correct that, in the context of Title VII, the Supreme Court and Second Circuit have recognized that retaliation for making a sex-based discrimination complaint is a form of sex-based discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015) (discussing how "substantively, retaliation is a form of discrimination" and how although the Supreme Court recognized this in the Title IX context, it applies "with equal force to the employment context.") (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74, 125 S.Ct. 1497 (2005)). Accordingly, because the Court believes that Plaintiff has also provided sufficient evidence to support her retaliation claim, (*see, infra*, Part II), which is directly tied to her sex-based discrimination complaint, the Court finds that Plaintiff has produced enough evidence to allow a jury to find an inference of discriminatory intent.

Lastly, the Court quickly addresses Defendant's meek argument that an inference of discrimination cannot be drawn because Fratto was fired by another woman. (Def. Mem. at 6.) This argument has been rejected by both the Supreme Court and Second Circuit. *See Feingold v. New York*, 366, F.3d at 155 ("We also reject the district court's suggestion that an inference of discrimination cannot be drawn because Feingold [(a Jew)] was fired by another Jew"); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human being of one definable group will not discriminate against other members of their group.") The Court need not dwell. It simply does not stand muster against the totality of evidence Plaintiff has adduced.

In sum, Plaintiff has provided ample facts supporting her claims of sex discrimination under Title VII. These facts support the inference that the reason Plaintiff was terminated relate to her sex, and the Defendant's proffered reason for terminating her was pretextual.

## II.   Retaliation Claim

The Court next turns to Plaintiff's retaliation claim. Again, to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that she participated in a protected activity, (2) that her employer was aware of this activity, (3) that she suffered an adverse employment action, and (4) that there was a causal connection between her engaging in the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125. If a Plaintiff makes a *prima facie* showing and the defendant provides a legitimate non-retaliatory reason for the adverse employment action, a plaintiff then must prove that the desire to retaliate was the but-for cause of the challenged employment action. *Nassar*, 570 U.S. 338.

Plaintiff argues that Fratto was discharged in retaliation for her complaints about sexual harassment. She argues that her claim is supported by: 1) the very close temporal proximity between Plaintiff's protected activity and Defendant's initiation of an adverse action against her, 2) the sequence of events and evidence of hostility toward Plaintiff after she complained of sex-based harassment, 3) the evidence that Plaintiff was treated less favorably than similarly situated probationary officers, and 4) the evidence of pretext regarding Defendant's articulated legitimate, non-retaliatory reason for terminating Plaintiff's employment. (Pl. Opp. at 21.) The Court agrees.

The Court begins by focusing on what Plaintiff has adduced to support her *prima facie* case. The parties first dispute whether Plaintiff has shown that Fratto participated in a protected activity. The parties do not dispute that Fratto complained to her superiors about the comments that were frequently being made by other officers about her alleged affair with Sgt. Long. Rather,

Defendant argues that such complaints do not constitute protected activity under Title VII because there is no semblance of a "gender-oriented motivation" in them. (Def. Mem. at 11.) Plaintiff, however, argues that she need only show that "she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." (Pl. Opp. at 12.)

Plaintiff is correct. To succeed on a retaliation claim, she need only show that she held a reasonably good faith believe that she was opposing an unlawful employment practice. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291 (2d Cir. 1998). The reasonableness of that good faith belief "is to be assessed in light of the totality of the circumstances. *Id.*

Here, Plaintiff provides sufficient proof to show that she reasonably believed she was reporting an unlawful employment practice. Not only were the comments subjectively offensive due to their sexually derogatory content, but even though they may not have explicitly been about her sex, they were the exact types of comments covered by Defendant's Discrimination and Anti-harassment Policy.

Recall that the comments included the following:

- When the phone rang in the female officers' locker room, an officer said "Oh that's for the whore, Fratto" (ECF No. 54, Ex.2.)

- Another officer in the locker room yelled to her "It's not who you know, it's who you blow." (ECF No. 43, Ex. E  62:16-18.)

- Officer Rooney once told her to stop having sex with Sgt. Long. (ECF No. 43, Ex. E 134:23-135:7.)

- Officer Rooney told her that she would ruin Sgt. Long's marriage, like someone else had done. (*Id.*)

- When Cpt. Bennett and Fratto reviewed the video footage, Cpt. Bennett chided "you're lying like you were lying about Sergeant Long." (*Id.* 123:13-15.)

Defendant's Policy provides as examples of Harassment:

- Epithets, slurs, negative stereotyping, or threatening, intimidating or hostile acts that relate to a protected characteristic or protected conduct.

- Demeaning comments regarding family members in connection with an employee's protected characteristic or protected conduct.

(*See* Policy, ECF No. 55, Ex.1, at 2.) It also provides the following explanation for Sexual Harassment: "offensive comments, jokes, innuendoes, gestures, or other sexually oriented conduct" or "unwelcome … verbal or physical conduct of a sexual nature" where "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (*Id.*)

The Policy also includes examples of the following conduct:

- Foul or obscene language or verbal or written abuse of a sexual nature, including demeaning, insulting, intimidating, or sexually suggestive verbal, written, recorded, or electronically transmitted messages.

- Sexually oriented or explicit remarks, including written or oral references to sexual conduct, gossip regarding one's sex life, body, sexual activities, deficiencies or prowess.

- Questions about one's sex life or experience.

(*Id.* at 2-3.)[4]

On the basis of the Policy alone, Fratto has show that she reasonably believed she was reporting unlawful conduct when she complained about the sexual rumors and comments. Secondly, courts nationwide have eschewed the artificial distinction between comments of a "sexual nature" and comments that patently target one's sex. *See Barnes v. Costle*, 561 F.2d 983 (D.C. Cir. 1977) (explaining that sexual harassment is a form of sex discrimination when a

---

[4] The Court again notes that the most important page of the Policy, which contains the most examples of harassment is page 2. This page is conspicuously missing in Defendant's exhibits. The full copy is provided only in Plaintiff's materials. (*Compare* ECF No. 55, Ex. 1 *with* ECF No. 43, Ex. G.) This patent error does not bode well for Defendant.

person's sex and sexual orientation are the reason they receive sexualized comments, behaviors, and solicitations); *Henson v. City of Dundee*, 682 F.2d 897, 900-01 (11th Cir. 1982) (explaining that a hostile work environment is actionable as sex discrimination under Title VII when a plaintiff can show that "but for the fact of her sex, she would not have been the object of harassment"); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual[ly] derogatory language is implicit, and thus should be recognized as a matter of course.") *Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (holding that sexual orientation discrimination is a form of sex discrimination because it is motivated by an employer's stance on a romantic association between particular sexes and thus is tied to an employees' sex). The consensus is clear. Where comments would not have been made but for one's sex and sexual orientation, they fall in the wide ambit of Title VII. Accordingly, Plaintiff has met her burden of proof on the first element.

The second element—that the employer knew about the protected activity—is not in dispute as Fratto circulated her complaint to several superiors, (*see* ECF No. 55, Ex. 2, Ex. 5, Ex. 7), and it prompted her supervisors to reprimand other officers at a lineup.

The third element too, is undisputed as there is no question that termination constitutes an adverse employment action under Title VII's broad anti-retaliation provisions. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62, 126 S. Ct. 2405, 2412 (2006)).

That leaves only the element of causation and whether Plaintiff submitted enough evidence for it to be more likely than not that her complaints were a but-for cause of her termination and that Defendant's proffered reasons for firing Fratto were pretext for her engaging in protected activity.

The Court first clarifies the standard for causation in a Title VII retaliation claim. The Second Circuit has repeatedly explained that a plaintiff need not convince a jury that retaliation was the *only* cause of the employer's action, but only that "the adverse action would not have occurred in the absence of a retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) (explaining that a plaintiff needs to show more than that retaliation was a "substantial" or "motivating" factor but does not need to show that it was the sole cause.) Put simply, a retaliatory motive need not be the sole reason an employee is terminated, but it must be an indispensable one.

Consequently, and particularly at the summary judgment stage, courts allow causation to be shown through a consortium of indirect evidence—often through indicia of temporal proximity, the context of surrounding events, disparate treatment between different employees, and general inconsistencies with the employer's proffered reason for termination. *See e.g., id.* ("Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks omitted).

Here, Plaintiff presented ample evidence to show a causal connection between Fratto's harassment complaints and her being fired. First, she highlights the foretelling sequence of events. Cpt. Bennett admitted during her deposition that she learnt of Fratto's complaint early on (Bennett Dep. 14:14-17), and then met with Fratto multiple times to discuss the issue one on one. (*Id*. at 16-20.) Cpt. Bennett also discussed the issue with her peers. (*See* Bennett Mem., ECF No. 55, Ex. 5).

Yet Cpt. Bennett testified that she was not even sure that she could recall Fratto's complaint. (Bennett Dep. at 24). Cpt. Bennett's inconsistencies in this litigation are unsurprising, as Plaintiff shows that from the onset, Critelli was reluctant to get Cpt. Bennett involved and told Fratto "it would be a good idea to handle it without getting the captain involved" even though it was Defendant's Policy to have employees make written complaints to their supervisors. (ECF No. 55, Ex 2.) Critelli's comment alone suggests that Defendant had a bias against complainers.

But there's more. After Plaintiff made a verbal complaint to Critelli and Catletti, she was threatened by officer Weir, who told her to keep her name clear or she would "go Talismanic" on Fratto. Plaintiff reported this as well. Within a month of Fratto filing her initial memo to Critelli and weeks of other officers notifying Cpt. Bennett of Fratto's combined complaints, Cpt. Bennet ordered that the surveillance video depicting the inmate misconduct be scrutinized. (ECF No. 55, Ex. 3.) When James Potter conducted an initial "extensive video review" on Cpt. Bennett's orders, he relayed to her that "no inappropriate conduct is observed." (*Id.*) Yet, Cpt. Bennett persisted with launching a full on "Supervisory Investigation" and sent Fratto a questionnaire with questions about the events without any context about these events. Fratto, who did not interpret the inmate incident on July 6, 2013 as anything significant, answered those questions without having watched the surveillance video.

The Court has reviewed the surveillance video submitted and finds that it could easily be interpreted differently be a trier-of-fact. While the Court finds it a stretch to argue that the video depicts any sexual assault taking place, it is not the Court's province to interpret the video—instead the Court suffices to say that the evidence raises factual issues that are clearly disputed.

The questionable video content, however, unravels Defendant's entire defense. Defendant's brief repeatedly belabors that the tectonic plates shifted when Fratto did the

unthinkable: lie during formal investigation. The record makes it abundantly clear that the investigation occurred shortly after Fratto made her harassment complaints, and there is some evidence to suggest that Fratto was cornered into interpreting the inmate event the same way as Bennett as she admitted being "embarrassed" and "untruthful" only after her Union Representative and Bennett pressured her to do so and said that she should give Cpt Bennett "what she wants." (*See* Fratto Dec., ECF No. 54) ("During our meeting, Captain Bennett claimed that it looked like LH had sexually assaulted me. When I told her that it did not happen and the video did not look that way to me, she yelled, "You are lying like you lied about Sergeant Long.") ("Captain Bennet told me to leave the meeting and speak with Sgt. Kiska and to bring back a new report concerning her "Supervisory Inquiry" questions. Sgt. Kiska then prepared a report that is attached to Defendant's motion papers as 'Exhbit N.' He used the word 'untruthful' about two of my previous answers…Sgt. Kiska told me that, by using that word, he was giving Capt. Bennet what she wanted. I had not been untruthful in my prior responses…Our interaction that night was not something that stuck out in my mind."); (*See also* Fratto Dep., ECF No. 43-5, at 120-126) ("Yeah [Kiska and I] spoke. He did a report for me and he helped me write a report. He said, "This is what she wants so we'll give it to her.' I don't even know where the report is.")

But to borrow Defendant's phrase, the "nail in the coffin" is that despite attaining favorable results from the seemingly unnecessary investigation, no officers, including Cpt. Bennett, bothered to discipline Fratto or train her on how to handle investigations or how to better handle investigations or disorderly conduct. Instead, Fratto was abruptly fired:

> Q: Was she ever disciplined with respect to her conduct during that incident?
> A: Not that I recall.
> Q: Did she ever receive any written counseling regarding that incident?
> A: Not that I recall.
> Q: Who would be responsible for administering disciplinary action of any kind with respect to her?

Q: Depending on the level. I'll speak in general. Depending on the level, there could be counseling by a sergeant, the first-line supervisor, it could be by a lieutenant, it could be by a captain.
Q: Do you know why she was never disciplined in connection with that incident?
A: Because she was terminated

(Bennett Dep. at 38-39.)

Fratto submitted copious evidence reflecting that other probationary officers who committed repeated infractions of similar or greater severity—such as endangering inmates who came off suicide watch or were allowed to wander about without accountability—were constantly being monitored, retrained, and steered for improvement. This includes Officers, like Stein, who also were dishonest with their written records. (*See* ECF No. 55, Ex. 9, Ex. 10, Ex. 11.) Indeed, all three officers about whom Fratto provides records ended up passing their probationary periods and attaining the rank of "Correction Officer" despite getting repeatedly unsatisfactory reviews.

The constellation of events, disparity in disciplinary treatment between Fratto and her male (non-complaining) officers, the inconsistencies in Cpt. Bennett's testimony and her written memos, along with Defendant's misleading evidentiary exhibits with critical pages missing all give an odor of discrimination, retaliation, and pretext. Proving discrimination and retaliation is an uphill battle as it is, but at the end of the day, if it looks like a duck, swims like a duck, and quacks like a duck, then it probably is a duck.

As Plaintiff has met her burden of proof an all the required elements for both her claims, Defendant's Motion for Summary Judgment is DENIED.

**CONCLUSION**

For the reasons discussed, Defendant's Motion for Summary Judgment is DENIED in its entirety. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 42. In addition, the parties are directed to appear for a pre-trial conference in my courtroom on April 4, 2019 at 11:00 a.m.

Dated:   March 8, 2019                    SO ORDERED:
         White Plains, New York

                                              NELSON S. ROMÁN
                                         United States District Judge